**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| TRUTH FOUNDATION MINISTRIES, NFP, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 15 C 7839 |
| | ) | |
| VILLAGE OF ROMEOVILLE, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Before the Court is Plaintiff Truth Foundation Ministries, NFP's ("TFM's") motion for a preliminary injunction against Defendant Village of Romeoville (the "Village") brought pursuant to Federal Rule of Civil Procedure 65(a).[1] Plaintiff TFM alleges that its rights under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc, *et seq*., which enforces the Free Exercise Clause of the First Amendment of the Constitution, are threatened with imminent, irreparable harm. The Court held an evidentiary hearing on December 21, 2015 to determine whether TFM is entitled to a preliminary injunction. For the reasons discussed below, the Court denies TFM's motion.

## BACKGROUND

### I.      The Sherman Property & Lease

TFM is a small church—typically having between 40 and 60 attendees—that conducts worship services on Sunday in a property located at 1413 Sherman Road, Units 10-20, in the

---

[1] TFM originally filed its motion as one for a temporary restraining order and preliminary injunction against the Village on September 11, 2015. (R.6.) The Village filed a response in opposition to TFM's motion on September 13, 2015. The Court held a hearing on September 14, 2015 and denied TFM's motion for a temporary restraining order. (R.11.)

M-R (Light Manufacturing Research Park) District of the Village. (*See* R.1, Compl., ¶¶ 4, 5, 8, 9.) TFM rents the Sherman Property from W.B. Romeoville Corporation pursuant to a written, seven-year lease executed on April 25, 2012. (R.6, at 2; R.1, ¶ 4; R.1-1, Lease.) The main use of TFM's property is for worship services that take place on Sunday, when surrounding businesses are closed. (*Id.*) The agreement between TFM and W.B. Romeoville Corp. is titled as a "Standard Industrial/Commercial Multi-Tenant Lease-Gross" (the "Lease") and indicates the seven-year term of the Lease commenced on June 1, 2012 and ends on June 30, 2019. (R.1-1, at 1.) The base rent for the Lease is $2,500 per month for the first two years with an increase per month thereafter, culminating in a monthly rent of $3,461.88 for the last year of the Lease. (*Id.*, at 1; *id.*, Addendum.) The Lease states that the "Agreed Use" is for "Church office and Church/Sunday School services". (*Id.*, at 1.) Section 2 of the Lease is entitled "Premises" and states "Lessor hereby leases to Lessee, and Lessee hereby leases from Lessor, the Premises, for the term, at the rental, and upon all of the terms, covenants and conditions set forth in this Lease." (*Id.*, at 2, § 2.1, Letting.) The Lease further notes in bold under the "Compliance" subsection that "Lessee is responsible for determining whether or not the Applicable Requirements, and especially the zoning are appropriate for Lessee's intended use, and acknowledges that past uses of the Premises may no longer be allowed." (*Id.*, at 2, § 2.3, Compliance.)

## II.     The Zoning Regulations & Procedures

### A.      The Zoning Code's Various Uses

The Romeoville Codified Code of Ordinances, Title XV, Land Usage, Chapter 159, contains a chapter referred to as the "Romeoville Zoning Code" ("Zoning Code"). (R.1-3, Section 159.01.) The Zoning Code classifies "churches" under various levels of "use" in each

District, either as a Special Use, a Conditional Use, or a Prohibited Use. (*See e.g.,* R.1-3, at 313, Section 159.51(A)(7); *id.*, at 318, Section 159.92(B)(1); *id.*, at 322, Section 159.100(B)(1).) The Zoning Code's defines "use" and "permitted use" as provided below:

> Use.
>
> The purpose for which land or a building thereon is designed, arranged, or intended, or for which it is occupied or maintained, let, or leased.

(R.1-3, at 46, Section 159.03.)

> Use, Permitted.
>
> Any use which is or may be lawfully established in a particular district or districts, provided it conforms with all requirements, regulations, and when applicable, performance standards of this Chapter for the district in which the use is located.

(*Id.*) The Zoning Code does not define a "Prohibited Use", but does state that "[w]hen a use is not specifically listed in the Sections devoted to permitted uses, special uses, accessory uses, temporary uses, signage, etc. it shall be determined that the uses are hereby prohibited." (R.1-3, at 124, Section 159.031.)

The Zoning Code also defines a subset of permitted uses, "conditional uses", and similarly defines "special uses", stating:

> Conditional Use. (See also SPECIAL USE) A use that would not be appropriate generally or without restrictions throughout the zoning district but which, if controlled as to number, area, location, or relation to the neighborhood, would not be detrimental to the public health, safety or general welfare.

(R.1-3, at 11, Section 159.03.) The Zoning Code defines a "Special Use" as:

> Special Use. (See also CONDITIONAL USE and USE, SPECIAL) Any use of land or buildings, or both, described and permitted herein, subject to the provisions of this Chapter.

(R.1-3, at 41, Section 159.03.)

> Use, Special.  A use that has unusual operational, physical, or other characteristics that may be different from those of the predominant permitted uses in a district, but which is a use that complements and is otherwise, or can be made, compatible with the intended overall development within a district.  Compliance with special standards not necessarily applicable to other permitted or special uses in the district shall be required as regulated in this Chapter.

(*Id.*)  The Zoning Code further indicates that for a "Special Use", "[n]o use of a structure of land that is designated as a 'special use' in any zoning district shall hereafter be established … in such district unless a special use permit has been secured in accordance with the provisions of Section 159.176 of this Ordinance."  Section 159.176(F) provides direction for filing an application for special use and further indicates, *inter alia*, that "[n]o special use permit shall be recommended … unless … (1) the use will not be unreasonably detrimental to or endanger the public health, safety, morals, comfort, or general welfare; (2) the use will not be injurious to the use and enjoyment of other property in the immediate vicinity for the purpose already permitted; (3) the use will not impede the normal and orderly development and improvement of surrounding property for uses permitted in the district; (4) adequate utilities, access roads, drainage have been provided; and (5) adequate measures have been or will be taken to provide ingress or egress so designed.  (*See* R.26, Romeoville IL Code of Ordinances, Chapter 159: Zoning Code ("Zoning Code".)

### B.  Churches

The Zoning Code defines a "church" as "[a]n institution that people regularly attend to participate in or hold religious services, meetings, and other activities.  The term 'church' shall not carry a secular connotation and shall include buildings in which the religious services of any denomination are held."  (R.1-3, at 10, Section 159.03; *see also id.*, at 32 (defining "Place of Worship" as "(See CHURCH)").)  There are twenty-four districts in the Village.  (R.1-3, at 74-75, Section 159.07).  The Village's zoning maps depict churches as a non-permitted use in five

districts that cover 36.3% of the Village—Manufacturing Districts (M-R, R-1, M-2), Public/Private and Land Conservation District (P-1), and Agricultural District (A-1). (*See* R.16; R.1-3, at 74-75).) The Village's zoning maps further depict churches as a "permitted use" in four districts—Airport Districts (AD-1 and AD-2), University District (UD), and Downtown District (D-D)—making up 12.1% of the Village. (*See* R.15, at 4; R.16.) The Village's characterization of these districts as categorizing churches as a "permitted use", however, does not come free of restrictions. Indeed, classification of a church as a "permitted use" in the Airport Districts and University District is by adoption of a church as a Special Use with various restrictions from District B-1. (R.1-3, at 313, Section 159.51(A)(7); *id.*, at 318, Section 159.92(B)(1); *id.*, at 322, Section 159.100(B)(1).) In addition, the permitted use of a church in the Downtown District is sub-classified as a "Conditional Use"[2] which specifies that church use is permitted "in buildings located within 150 feet of Normantown Road or Independence Boulevard provided that they face and their lots have frontage on Normantown Road or Independence Boulevard." (R.1-3, at 265, Section 159.76(B)(8)(h).)

The remaining districts that allow churches do so as a "Special Use" and comprise 51.6% of the Village with the primary district being the Planned Business District (P-B). (*See* R.16.) Each of these Districts requires additional conditions that the property: (1) fronts on a primary arterial or collector street, (2) is contiguous on at least one side to a business district, and (3) resides on a lot that is at least three acres and is not more than 30% occupied by buildings. (*See* R.1-3, Zoning Code, Section 159.60, Land Use Chart; Section 159.61(C)(6) (E-R, Estate Residential District); Section 159.62(C)(4) (R-1, Single Family Residential); Section

---

[2] The only place where land usage is sub-classified as a "Conditional Use" is in the Downtown District with all the listed conditional uses facing the noted restriction. (*See* R.1-3, at 265, Section 159.76(B)(8).)

159.63(C)(4) (R-2, Single Family Residential); Section 159.64(C)(4) (R-3, Single Family Residential); Section 159.65(C)(4) (R-4, Single Family Residential); Section 159.66(C)(4) (R-5, Single Family Residential); Section 159.67(C)(4) (R-6, Attached Residential); Section 159.68(C)(4) (R-7, General Residential); Section 159.69(C)(4) (R-5A, Single Family Residential); R.159.71(C)(1) (B-1 Local Shopping District).)

In the P-B, Planned Business District, which makes up the majority of the land area in the districts permitting "special use" churches, a church is subject to the above requirements, plus it is limited to a maximum square footage of 50,000 square feet, a lot between three-ten acres, and the property cannot have overhead or truck doors or manufacturing, industrial or warehouse type uses. (R.1-3, at Section 159.75(D)(10).) Furthermore, the use "shall be evaluated based on the entirety of the circumstances affecting the particular property in the context of the existing and intended future use of the property" including total square footage, size of the lot, peak hours of operation, primary and accessory uses, parking demand, traffic generation, other charitable and philanthropic uses in the area, efficient and creative use of subject property and "[o]ther criteria determined to be necessary to assess compliance with Section 159.176 [the Special Uses provision]. (*Id.*)

## III.    The Zoning Code Violation

After executing the Lease with W.B. Romeoville Corp., TFM expended over $50,000 to build out the church, including adding a second bathroom at the Village's direction, and adding a sanctuary. (R.1, ¶ 8; R.7, Oware-Baning Decl., ¶ 2.) The parties agree that the Village inspected the Sherman Property as TFM improved it on April 13, 2012, after the build-out on March 12, 2013, and again after TFM began operating as a church on October 14, 2014. (R.1, ¶ 8; R.1-4, Inspection Reports.)

According to TFM, the Village knew of TFM's use of the Sherman Property as a church since the inspections, but did not raise any zoning concerns until after TFM actively operated as a church. In a letter to the Sherman Property landlord on February 26, 2015, the Village indicated that TFM's use of the Sherman Property violated the Village's Code of Ordinances (the "Code"). (R.1, ¶ 8-9; R.1-5, Letter from the Village to S.Whitman, landlord of the Sherman Property.) The Code prohibits churches in the M-R (Light Manufacturing Research Park) zone where the Sherman Property is located. (R.1, ¶¶ 8-9; R.1-5; R.1-3, Chapter 159, Zoning Code.) In its February 2015 letter, the Village requested that TFM relocate and "find a new location that satisfies the entire Village's Code of Ordinances" by September 1, 2015. (R.1-5, at 5.)

On March 12, 2013, the Village Fire Department performed an annual fire inspection and informed TFM that it did not have an occupancy or business license. (R.10-1, at PageID #:309; PI Hrg., Ex. 31.) On April 8, 2013, Pastor Kwaku Oware-Baning submitted an Exempt Organization Application. (R.10-1, at PageID #:309.) On May 1, 2013, the Village sent a letter to TFM, addressed to the Sherman Property, advising it that the Village had "received your application for an Exempt Organization License," and that the Village could not "approve of your organization to locate at [the Sherman Property]" because "[c]hurches or places of worship are not a permitted use in the M-R (Light Manufacturing Research Park) Zoning District." (R.10-1, at PageID #:310.) Mr. Anthony Casaccio, an Illinois attorney, submitted a Request for Zoning Verification Letter to the Village on December 21, 2014 asking for the zoning designation at the Sherman Property. (R.10-1, at PageID #:311.) Jamie Tate, a Village Planner for the Village, responded on January 12, 2015, indicating that it had "been advised that there is a church or place of worship occupying a portion of [the Sherman Property]" and that such use is not allowed in the M-R Zoning District. (R.10-1, at PageID #:312.) On February 10, 2015, the

Village met with Pastor Oware-Baning to discuss the situation and help him try to find a proper location for TFM in the Village, giving him six months to do so. (R.10-1, at PageID #:309.)

After the meeting, the Village followed up in a letter to Pastor Oware-Baning, stating:

> As discussed, churches and/or places of worship are not a permissible use in the M-R Zoning District (Light Manufacturing District) which is the zoning designation for [the Sherman Property]. The Village has not issued a Business License or Certificate of Occupancy allowing [TFM] to operate at this location. All of the work done inside the space was completed without a valid building permit from [the Village].
>
> In order to allow you time to relocate, the Village is providing you with six (6) months to find a new location and move by September 1, 2015. … If we can do anything to assist you in your relocation, please do not hesitate to contact anyone in our office. …

(R.10-1, at PageID #:316 (Letter from Mr. Tate to Pastor Oware-Baning dated February 12, 2015).) The Village's Community Development Director, Steve Rockwell, sent a second letter to Mr. Scott Whitman, Sherman Property landlord, informing him that the Village had reviewed the files, business licenses, and fire and building inspections for the Sherman Property, and stated:

> We found a great track record of rental inspections, business license applications and occupancy permits for other existing tenants and previous tenants in [the Sherman Property]. That same level of diligence or same typical process was not followed by [TFM] or your client on the church's lease and/or when they occupied the space.

(R.10-1, at PageID #:352 (Letter from Mr. Rockwell to Mr. Whitman dated February, 26, 2015.) The letter further described Mr. Rockwell's experience visiting the Sherman Property on the morning of February 15, 2015 where he found member's vehicles parked in areas prohibiting passage of a path that "an emergency vehicle may need to" follow. (R.10-1, at PageID #:352.) Mr. Rockwell further stated that "[a]fter further investigation, our zoning interpretation is that churches/places of worship are not an allowed use in the M-R (Light Manufacturing Research Park) Zoning District." (R.10-1, at PageID #:353.)

On February 27, 2015, Mr. Whitman sent a letter to Pastor Oware-Baning, attaching a copy of the February 26, 2015 letter Mr. Whitman had received from the Village. (R.1-5, Letter from Mr. Whitman to Pastor Oware-Baning, dated February 27, 2015.) Mr. Whitman indicated that "our efforts have not been successful and the Village insists that, as requested in its earlier Notice to Vacate directed to you that you vacate the Premises." (*Id.*) Mr. Whitman further conveyed the landlord's distress stemming from a purchaser's withdrawal from the purchase and sale transaction due to the status of TFM's occupancy. (*Id.*) In addition, Mr. Whitman indicated that the landlord "may agree to release you from further rent liability under the Lease," if TFM "agree[s] to vacate no later than May 31, 2015 and remove the stage and wood flooring and leave the Premises in good condition." (*Id.*)

A few months later, on April 6, 2015, Mr. Tate sent another letter to Pastor Oware-Baning at the Sherman Property to "touch base … in regards to [TFM's] relocation search" and reminded him that TFM had to find a new location by September 1, 2015 because TFM did not have occupancy granted by the Village for the Sherman Property location. (R.10-1, at PageID #:355.) Mr. Tate and Mr. Rockwell met again with Pastor Oware-Baning on April 28, 2015 to discuss the relocation situation. (R.10-1, at PageID #:347.) An additional meeting was scheduled for August 17, 2015 between TFM and the Village, but no one representing TFM attended. (R.10-1, at PageID #:309.)

IV.     **TFM's Property Search**

Although TFM and its real estate agent, Andrew Polivka, have looked for alternative properties in the Village, they have not found a suitable property that TFM can operate as a church under the Zoning Code. (R.1, ¶ 10.) TFM's Pastor Oware-Baning and a large number of the attendees live in the Village. (R.6, at 2.) In February 2015, a Village employee, Scott

Williams, emailed Pastor Oware-Baning three potential church locations. (R.7, ¶ 6; R.6-1; PI Hrg., Tr. 75:2-24 (Exs. 22, 24, 26, & 39).) TFM inspected each of the properties and found the spaces unacceptable either due to the limiting size of the space or to the alleged prohibitively high costs with the purchase price for one property at $1,400,000 and a monthly rent of $5,000 on a second property. (*Id.*) TFM found another location at the right price point ($600,000), but the Village informed TFM that it could not be operated as a church in that zone. (R.7, ¶ 7; PI Hrg., Tr. 78:25-80:16 (Ex. 23).) TFM's real estate agent has searched for additional locations, but has not provided any additional listings. (R.7, ¶ 8.)

## V.    The Dispute

TFM alleges that its rights under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), are threatened with imminent, irreparable harm. Specifically, TFM argues that the Village, through its Zoning Code, completely excludes small churches from its jurisdiction and unreasonably restricts small churches within its districts in violation of RLUIPA. TFM further argues that the Village treats nonreligious and religious assemblies unequally and that in the M-R District, for example, the Village unlawfully provides museums and art galleries with more favorable treatment than churches, in violation of RLUIPA's equal terms requirements. Accordingly, TFM filed its motion for injunctive relief before engaging in any discovery, seeking to enjoin the Village from engaging in activities that will not allow TFM to continue operating its church at its present location. Namely, TFM seeks injunctive relief and asks the Court to:

- restrain the Village from threatening, interfering with, or causing the removal of TFM from the Sherman Property;

- restrain the Village from pursuing the pending state court action and from filing or prosecuting any additional litigation in another court seeking eviction of TFM from the Sherman Property;[3] and

- restrain the Village from assessing fines for operating the church at the Sherman Property; and from initiating any further prosecutions against TFM for the use of the Sherman Property as a church.

(*See* R.6.)

## VI. Evidentiary Hearing

On December 21, 2015, the Court held an evidentiary hearing on TFM's motion for a preliminary injunction. During the hearing, TFM called the following witnesses: Pastor Kwaku Oware-Baning and TFM's real estate agent, Mr. Andrew J. Polivka. The Village called the following witnesses: the Village's Community Development Director, Mr. Steven W. Rockwell, and a Village Planner, Ms. Jamie Tate.

### A. Mr. Polivka—the Real Estate Agent & Broker

Mr. Andrew J. Polivka is a real estate agent who has transacted over one-hundred property sales in Romeoville throughout his career. (PI Hrg. Tr., 14:1-13.) Mr. Polivka testified regarding his familiarity with land values in the Village and how they differ between retail and manufacturing districts with land in retail districts costing at least two times as much as land in the manufacturing districts. (PI Hrg. Tr., 14:6-7, 15:22-16:7:18.) TFM's Sherman Property, for example, is located in the M-R District and consists of 4,350 square feet that costs TFM about $3,168.00 per month (~$8.74 per square foot). (PI Hrg. Tr., 16:8-17:10.) By contrast, property in retail districts of the Village cost anywhere from $18-24 per square foot. (PI Hrg. Tr., 17:11-14.) Mr. Polivka testified that the 3-acre restriction for churches equates to a base investment for

---

[3] TFM made this request in its motion for temporary restraining order at a time while unaware that the Village had filed an action in state court seeking to evict TFM. (*See* TRO Hrg. Tr., Sept. 14, 2015, at 1:8-19.) TFM, therefore, modified its request for relief to seek restraint of the Village from proceeding with the state court action "as well as not taking any actions to effectively or by implication evict us somehow." (PI Hrg. Tr., Dec. 21, 2015 (PM), at 40:13-41:6.)

a church of approximately $750,000 for land, presuming even a low square footage cost of $6.50/sq.ft. and permissible use in a manufacturing district.  That investment increases to "well over a million dollars" if you move into "a retail or office or business area."  (PI Hrg. Tr., 17:20-19:13.)  Mr. Polivka testified that his understanding of what TFM needs is a space of a similar size to the Sherman Property (~4,500 sq. ft.) available within a monthly rental budget of ~$3,200-4,000.  (PI Hrg. Tr., 30:23-25.)  Mr. Polivka conducted a property search looking at available properties in the airport and university zones (AD-1, AD-2, and U-D zoning districts—districts that allow churches as "permitted uses") and found no 3-acre lots available.  (PI Hrg. Tr., 20:1-20.)  Mr. Polivka further testified that even if the 3-acre minimum were removed, there was nothing comparable in size or cost to TFM's current Sherman Property location.  (PI Hrg. Tr., 21:2-13.)  The 3-acre restriction does not apply in the Downtown District (D-D), Polivka testified, but this District is very small (only about 2x3 blocks) and only smaller lots are available that meet the requirement for a church, *i.e.,* fronts and faces, and is located within 150 feet of Normantown Road or Independence Blvd.  (PI Hrg. Tr., 21:14-22:14; *see also* R.26, Zoning Code, § 159.076 (8).)  Mr. Polivka testified that in conducting a search within the entire jurisdiction for available properties in the Village to operate as a church abiding by the 3-acre requirement, he did not find any properties that fit TFM's space and budget needs.  (PI Hrg. Tr., 24:25-25:22; 29:8-31:1.)

B.      **Pastor Oware-Banning**

Pastor Oware-Baning, one of TFM's pastors, testified that TFM first began in 2006 and now has approximately 80 church members primarily from Africa who now live in the Village and surrounding area of Bolingbrook, Illinois.  (PI Hrg. Tr., 34:11-22; 41:4-6.)  TFM provides special services for its members, speaking in their local African dialects which "means they feel

they are back home worshipping." (PI Hrg. Tr., 39:9-15.) According to Pastor Oware-Baning, TFM previously held services at Bolingbrook High School, but sought out a new location when it was unable to hold services on holidays during school district closures. (PI Hrg. Tr., 35:9-15.) TFM has been in the Sherman Property for over two years and enjoys the area because it is quiet and the property is cost-effective. (PI Hrg. Tr., 35:16-21; Ex. 30, Lease; *see also* R.1-1.) TFM's income is generated from church members' tithes and offerings. (PI Hrg. Tr., 40:3-19.) TFM entered into its lease for the Sherman Property in April 2012. (PI Hrg. Tr., 37:9-11.) The Village conducted a rental inspection of the Sherman Property on April 13, 2012—which TFM did not pass—and the Village informed TFM that it would need a second ADA-compliant washroom since more than 40 people were attending services there. (PI Hrg. Tr., 43:23-44:13; Ex. 27, Rental Property Inspection Form; *see also* PI Hrg. Tr., 27:25-28:19 (Polivka).) After signing the lease, TFM began making improvements to the property including cleaning, rebuilding bathrooms, and building out office space. (PI Hrg. Tr., 41:4-42:19; Exs. 1, 2, Sherman Property Photos; Ex. 29, Rental Property Inspection Form.) TFM used the majority of its money for improvements in the space that is now the sanctuary, *e.g.,* putting in hard wood floors. (PI Hrg. Tr., 42:12-17; Ex. 3, 4, Sherman Property Photos.) Within a few months of making improvements to the property, TFM began conducting worship services there. (PI Hrg. Tr., 41:7-9.) Pastor Oware-Baning admitted that TFM did not have a permit for the work it did in the sanctuary because he thought the bathroom work permit would cover all improvement work and even if it did not cover the sanctuary work, he did not think a separate permit was needed. (PI Hrg. Tr., 43:23:-45:19.)

On April 2, 2013, Pastor Oware-Baning submitted an Exempt Organization Registration form to the Village seeking permission to use the Sherman Property for religious activities. (PI

Hrg. Tr., 61:19-62:1; Ex. 32, Exempt Organization Form.) On May 1, 2013, Jamie Tate, the

Village Planner, sent TFM a letter indicating that "the Village is unable to approve of your

organization to locate at 1413 Sherman Road, Unit 10. Churches or places of worship are not a

permitted use in the M-R (Light Manufacturing Research Park) Zoning District". (Ex. 33, May

1, 2013 Letter from J.Tate to TFM.) Although Pastor Oware-Baning received this May 1, 2013

letter in September 2015 when Ms. Tate attached it to an email sent to TFM, he testified that he

did not receive the letter prior to that time. (PI Hrg. Tr., 62:10-63:6.) Almost a year and a half

later—in October 2014—the Village Fire Department conducted a fire inspection of the Sherman

Property. (PI Hrg. Tr., 60:1-5, 63:16-20; Ex. 35, Fire Inspection Report).

Pastor Oware-Baning testified that in February 2015 a representative of the landlord

informed him that they would "have to change the leasing from the church to my business"

because the Village said that TFM "can't have a church" at the Sherman Property. (PI Hrg. Tr.,

67:2-11.) Pastor Oware-Baning then had a meeting with "some officials" from the Village,

including Mr. Rockwell to discuss TFM's occupancy at the Sherman Property. (PI Hrg. Tr.,

67:12-68:4.) After that meeting, on February 12, 2015, Pastor Oware-Baning received a letter

from the Village indicated that "[t]he Village has not issued a Business License or Certificate of

Occupancy allowing Truth Foundation to operate at this location. All of the work done inside

the space was completed without a valid building permit from the Village of Romeoville."

(Ex.40, Feb. 12 Letter from J.Tate to Pastor Oware-Baning; *see also* R.10-1, at PageID #:316.)

The Village further indicated "[i]n order to allow you time to relocate, the Village is providing

you with six (6) months to find a new location and move by September 1, 2015." (*Id.*) A few

weeks later, TFM received a letter from the landlord, Mr. Whitman, which, in turn, provided a

copy of a letter Mr. Whitman received from the Village in response to his "request that the

Village make some allowances and allow you to continue with your occupancy at the Premises."
(Ex. 37, Feb. 27, 2015 Letter from S.Whitman to Pastor Oware-Baning; Ex. 36, Feb. 26, 2015
Letter from S.Rockwell to S.Whitman.)  Mr. Whitman indicated that "our efforts have not been
successful and the Village insists that, as requested in its earlier Notice to Vacate directed to you
that you vacate the Premises."  (*Id.*)  Mr. Whitman further indicated that "as a result of the status
of your occupancy, at the last moment, the Purchaser of the Property elected to terminate the
Purchase and Sale Agreement and withdraw from the purchase and sale transaction.  This sale
transaction has been ongoing since September 2014 …"  (*Id.*)  Mr. Whitman requested that TFM
"agree to vacate earlier" than the September 1, 2015 date provided by the Village because "it is
extremely difficult to market space in the fall and winter months."  (*Id.*)

According to Pastor Oware-Baning, TFM began conducting its property search with Mr.
Polivka at that time and has continued to do so.  He stated that the process of moving the church
to a new location would take about six to eight months because the church has to locate a
suitable property and raise money—at least about 30% of the sale price.  (PI Hrg., 108:1-13.)

### C. Ms. Jamie Tate—the Village Planner

Ms. Jamie Tate is a Village Planner for the Village of Romeoville and has worked at the
Village for eight years.  (PI Hrg. Tr., 110:23-24, 112:14-17.)  In her position, Ms. Tate
"manage[s] the entire business license and exempt organization process from when somebody
makes a phone call to see if they can locate somewhere to at the end when we sign off and give
them … a certificate to move in."  (PI Hrg. Tr., 111:22.)  Ms. Tate testified that TFM's building
file—a file which has to do with permits, but is separate from zoning—does contain a bathroom
permit, but does not contain any permits having to "do with the church".  (PI Hrg. Tr., 112:25-
113:22.)  Ms. Tate—being the "person that manages business license process so generally I

know every business that is looking anywhere"—first became aware of TFM's use of the Sherman Property as a church on March 12, 2013 when the fire department told her that during their annual inspection, they saw a church being operated there. (PI Hrg. Tr., 114:20-115:5.)

After the Sherman Property's fire inspection, TFM filed its Exempt Organization Application, Ms. Tate responded by letter and never received a response. (PI Hrg. Tr., 117:6-25.) She testified that the Village, at that time, had no plans to "kick the church out" and "kind of sat on it honestly" because "[i]t's just not in the Village's procedure … to keep going—we were hoping that … they would maybe be looking for a new location, things of that nature." (PI Hrg. Tr., 118:3-7.) After receiving a request in December 2014 from a potential buyer for the Sherman Property, Ms. Tate sent a Zoning Verification Letter that indicated that the "Village has been advised that there is a church or place of worship occupying a portion of [the Sherman Property], but has not currently investigated or verified the same. A church or place of worship is not an allowed use in the M-R Zoning District." (Def. Ex. 1; *see also* R.10-1, at Page ID #:312.) In addition, the Village noted "[e]xcept as otherwise set forth in this letter, there are no known zoning violations at this property." (*Id.*) Ms. Tate testified "[a]fter this letter was sent, I think it put a stop on the transfer of the property." (PI Hrg. Tr., 125:5-9.) TFM's pastor then came to the Village to resolve the issues. During the year and a half prior to receiving the letter, the Village did not act, which according to Ms. Tate, was primarily due to the Village's lack of manpower or employees to pursue people who were not in the correct zoning district. She explained that a zoning verification letter like that sent by the landlord's potential buyer "is what triggers those things to kind of resolve then." (PI Hrg. Tr., 124:13-2.) At subsequent meetings with TFM, although not required to do so, the Village attempted to assist TFM in identifying available properties. (PI Hrg. Tr., 12:16-128:1.) After the Village gave TFM six months to

vacate the Sherman Property, Ms. Tate sent a follow up letter in April 2015 and although a meeting had been scheduled between the Village, the Mayor, Mr. Polivka, and Pastor Oware-Baning in July 2015, Pastor Oware-Baning cancelled the meeting and rescheduled for August, but Pastor Oware-Baning did not attend on behalf of the church, "so, the only person that came to the meeting for the church was Andy Polivka".  (PI Hrg. Tr., 130:1-131:1.)  Ms. Tate is unaware of any additional discussions, requests from the church or meetings that have occurred prior to the filing of the state court action and the present litigation.  (PI Hrg. Tr., 131:8-132:6.)

Furthermore, Ms. Tate testified that most churches in the Village are located in residential zoning districts and that in order to locate there, a church must obtain a special use permit which entails providing information related to the number of members attending, available parking and "just general kind of things you want to know about a business."  (PI Hrg. Tr., 133:20-134:12.)  Ms. Tate testified that she is aware of three churches that have been granted special use during her time working with the Village and is not aware of a church being denied a special use.  (PI Hrg. Tr., 134:25-135:7.)  In addition, she testified that although she did not write the zoning code, the spatial restrictions placed on churches in the zoning code may address concerns for having the right amount of space for people and parking, but that she has never seen those requirements prevent a church from locating in those districts.  (PI Hrg. Tr., 135:11-136:4, 138:12-13.)  Ms. Tate also testified that she is unaware of any other use that has the three-acre restriction and is also unaware of any specific reasons for the three-acre limitation placed on churches.  (PI Hrg. Tr., 2:6-9; 7:6-8.)

### D. Mr. Steven Rockwell—Village Community Development Director

Mr. Rockwell has worked in the Village for twelve years and currently serves as the Community Development Director.  (PI Hrg. Tr., 12:10-17.)  Mr. Rockwell started his career as

a planner, then worked in zoning administration, and is currently the Zoning Administrator for the Village. (PI Hrg. Tr., 13:5-11.) Mr. Rockwell testified that the Village's Zoning Code provides for different zoning attributes for different zoning districts and that most zoning codes start with the intent and purpose for each particular district to clarify the overall intent. (PI Hrg. Tr., 13:13-14:1; *see, e.g.,* R.26, § 159.081.) Mr. Rockwell testified about the M-R Light Manufacturing District and the Village's intention to provide adequate parking and road access for the manufacturing uses, and to group the manufacturing uses to oppose and discourage safety hazards and nuisance traffic by strip commercial or industrial developments. (PI Hrg. Tr., 15:8-16:2.) Mr. Rockwell further testified that M-R District is not suitable for uses that include large congregations or assemblies of people because the buildings are small and safety concerns exist with fire code and building access. (PI Hrg. Tr., 16:5-18:22.) After visiting the Sherman Property on a Sunday, Mr. Rockwell identified this concern when he noticed cars parked on the street due to a heavy snowfall and parking spaces designated for other tenants occupied by the parishioners. (PI Hrg. Tr., 20:1-25.) Mr. Rockwell also attempted to circle the building on that Sunday, but the cars blocked his access. (PI Hrg. Tr., 21:2-6.) Mr. Rockwell further noted that the M-R District has heavy truck traffic with semi-trucks regularly moving through the area, which makes street-parking a concern since the trucks need to have wide access to the roads and nearby interstate. (PI Hrg. Tr., 21:7-22:2.)

Although there are currently no museums or art galleries exist in the M-R District, Mr. Rockwell testified that the Zoning Code permits museums and art galleries without a special use permit and that "it's possible" that such art gallery or museum could host a showing of over 80 people. (PI Hrg. Tr., 24:24-25:13.) In addition, he explained that the museums and art galleries in the M-R District do not have a three-acre minimum restriction placed upon them. (PI Hrg. Tr

18

25:18-20.)  Although the Zoning Code imposes a three-acre minimum on churches, Mr.

Rockwell stated: "I guess I do want to suggest that special uses do come to the Village Board.

Three acres can be modified, changed, reduced to one acre.  It is a special use consideration of

all those.  So, even though it says three acres, we do have churches that are not on three acres."

(PI Hrg. Tr. 33:11-15.)

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right."  *Winter*

*v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008); *see*

*also Lettuce Entertain You Enters., Inc. v. Leila Sophia AR, LLC*, 703 F.Supp.2d 777, 783 (N.D.

Ill. 2010) ("A preliminary injunction is 'an exercise of a very far-reaching power, never to be

indulged in except in a case clearly demanding it'") (citation omitted).  A preliminary injunction

is "a way to maintain the status quo until merits issues can be resolved at trial."  *Michigan v. U.S.*

*Army Corp of Eng'rs,* 667 F.3d 765, 783 (7th Cir. 2011).  To obtain a preliminary injunction, the

movant must demonstrate (1) a likelihood of success on the merits, (2) that it will suffer

irreparable harm absent injunctive relief, and (3) that it has no adequate remedy at law.  *See*

*Smith v. Executive Dir. of Ind. War Mem'ls Comm'n*, 742 F.3d 282, 286 (7th Cir. 2014).  This

"likelihood" standard requires more than a "mere possibility of relief" and more than a "better

than negligible" showing.  *Nken v. Holder*, 556 U.S. 418, 129 S.Ct. 1749, 1762, 173 L.Ed.2d 550

(2009) (discussing similar standards for issuance of stay).  If the moving party makes this

showing, then the Court weighs the factors against one another, assessing whether the balance of

harms favors the moving party or whether the harm to other parties or the public is sufficiently

weighty that the injunction should be denied.  *BBL, Inc. v. City of Angola*, 809 F.3d 317, 324

(7th Cir. 2015).  The Court then "weighs the balance of potential harms on a 'sliding scale'

against the movant's likelihood of success: the more likely he is to win, the less the balance of harms must weigh in his favor; the less likely he is to win, the more it must weigh in his favor." *Turnell v. CentiMark Corp.*, 796 F.3d 656, 662 (7th Cir. 2015).

## ANALYSIS

### I.    RLUIPA

TFM's Complaint alleges that the Village violated RLUIPA and the Illinois Religious Freedom Restoration Act ("IRFRA").  More specifically, TFM alleges: (1) the Village's Zoning Code violates RLUIPA's prohibition of unreasonably and completely excluding religious exercise (Count I); (2) the Village's Zoning Code violates RLUIPA's prohibition of treating religious assemblies and institutions on less than equal terms as nonreligious assemblies and institutions, and that such treatment has made it impossible for TFM to relocate within the Village (Count II); and (3) the Village totally and unreasonably excluded TFM from its jurisdiction in violation of IRFRA by treating TFM on less than equal terms as nonreligious assemblies and institutions (Count III).  TFM does not move for its preliminary injunction based on IRFRA.  Instead, it premises the motion on an alleged violation of RLUIPA.

"Congress enacted RLUIPA and its sister statute, the Religious Freedom Restoration Act of 1993 (RFRA), 107 Stat. 1488, 42 U.S.C. § 2000bb *et seq.,* 'in order to provide very broad protection for religious liberty.'" *Holt v. Hobbs*, ___ U.S. ___, ___, 135 S. Ct. 853, 859, 190 L. Ed. 2d 747 (2015) (*quoting Burwell v. Hobby Lobby Stores, Inc., 573 U.S. ___, ___, 134 S.Ct. 2751, 2760, 189 L.Ed.2d 675 (2014)).  "RLUIPA is the latest of the long-running congressional efforts to accord religious exercise heightened protection from government-imposed burdens, consistent with [Supreme Court] precedents." *Cutter v. Wilkinson*, 544 U.S. 709, 714, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005).  RLUIPA provides protections for land use for religious

exercise, *see* 42 U.S.C. § 2000cc, and contains provisions that protect religious persons—

including religious assemblies or institutions—from land use regulations that (1) substantially

burden their free exercise of religion (*see id.*, § 2000cc(a)), and (2) discriminate against them or

exclude them on the basis of religion or religious demonstration (*see id.*, § 2000cc(b)).  As

explained by the Fifth Circuit:

> Section 2 of RLUIPA, which protects religious land uses and is at issue in this
> case, contains two subsections that limit land-use regulations.  The first
> subsection contains the Substantial Burden Clause, which prohibits the imposition
> or implementation of a land use regulation in a manner that imposes a "substantial
> burden" on the religious exercise of a person, assembly, or institution unless the
> government can show that the regulation furthers a "compelling governmental
> interest" by "the least restrictive means." § 2000cc(a).  The second subsection
> contains three provisions under the heading "Discrimination and exclusion."
> § 2000cc(b).  The Equal Terms Clause prohibits imposing or implementing a land
> use regulation so as to treat a religious assembly "on less than equal terms" than a
> nonreligious assembly. § 2000cc(b)(1).  The Nondiscrimination Clause prohibits
> imposing or implementing a land use regulation so as to discriminate against an
> assembly or institution on the basis of religion. § 2000cc(b)(2). The third
> provision concerns "Exclusions and limits" and contains two subparts that
> prohibit: (A) "totally exclud[ing] religious assemblies from a jurisdiction"; and
> (B) imposing or implementing a land use regulation that "unreasonably limits
> religious assemblies, institutions, or structures within a jurisdiction."
> § 2000cc(b)(3).

*Opulent Life Church v. City of Holly Springs, Miss.,* 697 F.3d 279, 290 (5th Cir. 2012).

Here, TFM alleges that the Village's Zoning Code is in violation of the Equal Terms

Clause and the Exclusions and Limits Clause of RLUIPA's discrimination and exclusion

provision, Section 2000cc(b).  (*See* R.1, ¶¶ 2-21.)  TFM has not alleged a violation of the

Substantial Burden Clause, Section 2000cc(a), or the Nondiscrimination Clause, Section

2000cc(b)(2).  The sections of RLUIPA relevant to this case provide:

> (b) Discrimination and exclusion

> (1) Equal terms

No government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution.

…

(3) Exclusions and limits

No government shall impose or implement a land use regulation that—

(A) totally excludes religious assemblies from a jurisdiction; or

(B) unreasonably limits religious assemblies, institutions, or structures within a jurisdiction.

42 U.S.C. § 2000cc(b)(1), (b)(3).

Specifically, TFM alleges "facial" and "as applied" challenges[4] to the Village's Zoning Code, alleging that the Code violates Section 2000cc(b)(1) because of the unequal treatment it imposes on churches within the M-R district in which the Sherman Property is located (Count II), and is in violation of Section 2000cc(b)(3)(A)-(B) because it completely excludes and unreasonably excludes small churches within its jurisdiction (Count I). The Village responds that TFM does not have a reasonable likelihood of success on Count I or Count II and faces no irreparable injury because the concurrent Illinois state case provides an adequate remedy at law.

## II.     TFM Has Failed to Establish Likelihood of Success on the Merits

The Seventh Circuit has repeatedly held that a party must prove that it is reasonably likely to succeed on the merits in order to obtain a preliminary injunction. *See Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006). Under the circumstances, TFM must show a reasonable likelihood of success that: (1) the Code violates RLUIPA's prohibition of unreasonably and completely excluding religious exercise (Count I), or (2) that the Code violates

---

[4]  Although "facial" and "as applied" challenges may overlap conceptually, if the claim and relief sought reach beyond the plaintiff's particular circumstances, it is a "facial challenge". *John Doe No. 1 v. Reed*, 561 U.S. 186, 194, 130 S.Ct. 2811, 177 L.Ed.2 493 (2010); *Center for Indv. Freedom v. Madigan*, 697 F.3d 464, 475 (7th Cir. 2012).

RLUIPA's prohibition of treating religious assemblies and institutions on less than equal terms than nonreligious assemblies and institutions, and that such treatment has made it impossible for TFM to relocate within the Village (Count II). The Court addresses each argument in turn.

###### A.    Total Exclusion Under Section 2000cc(b)(3)(A)

TFM alleges that the Zoning Code violates Section 2000cc(b)(3) of RLUIPA, which provides that "[n]o government shall impose or implement a land use regulation that—(A) totally excludes religious assemblies from jurisdiction; or (B) unreasonably limits religious assemblies, institutions, or structures within a jurisdiction."  42 U.S.C. §§ 2000cc(b)(3)(A)-(B). The Zoning Code at issue falls within RLUIPA's definition of a "land use regulation" as meaning "a zoning or landmarking law, or the application of such a law, that limits or restricts a claimant's use or development of land (including a structure affixed to land), if the clamant has … [a] leasehold… interest in the regulated land."  42 U.S.C. § 2000cc-5.  Moreover, TFM's use of the Sherman Property is a "religious exercise", as defined by RLUIPA, to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief" and extending to the use or intended use of property for that purpose as shown by the "use, building, or conversion of real property for the purpose of religious exercise".  42 U.S.C. § 2000cc-7.  As explicitly noted by Congress, RLUIPA "shall be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of [RLUIPA] and the Constitution."  42 U.S.C. § 2000cc-3; *see also Holt*, 135 S.Ct. at 860.

TFM argues that the Village's restrictions on churches, even as "permitted uses", violate RLUIPA because they totally exclude churches from locating in the Village and unreasonably limit them.  TFM asserts a violation of the exclusions clause, which prohibits total exclusion of religious assemblies, but does not prevent the selective exclusion of religious assemblies in

certain districts or by imposition of additional requirements. *See Vision Church v. Vill. of Long Grove,* 468 F.3d 975, 989 (7th Cir. 2006) (explaining that the defendant—"by permitting churches in all residential districts as a special use [with additional restrictions], has not completely or totally excluded religious assemblies from its jurisdiction" in violation of RLUIPA). TFM's facial and as applied challenges based on total exclusion sweep too broadly as the Zoning Code's restrictions on churches do not "completely or totally exclude religious assemblies from its jurisdiction," but instead set criteria that a church must meet to locate within certain permissible districts of the Village. *See id.*; 42 U.S.C. § 2000cc(b)(3)(A).

More specifically, the Village has presented uncontested evidence that in its twenty-four Districts, churches are only prohibited in 36.3% of the Village. (R.1-3, at 74-75, Section 159.07.) The Zoning Code limits these prohibitions to the following Districts: (1) Manufacturing Districts (M-R, R-1, M-2), (2) Public/Private and Land Conservation District (P-1), and (3) Agricultural District (A-1). (*See* R.16; R.1-3, at 74-75.) The Zoning Code does provide that churches are "permitted uses" in four other Districts—Airport Districts (AD-1 and AD-2), University District (UD), and Downtown District (D-D)—making up 12.1% of the Village. (*See* R.15, at 4; R.16.) While these "permitted use" Districts include restrictions[5], Plaintiff has failed to establish that they result in a blanket exclusion of churches. Indeed, there are several churches in these "permitted use" Districts.

The remaining Districts that allow churches do so as a "Special Use" and comprise 51.6% of the Village. Each of these "special use" Districts imposes additional conditions that

---

[5] Classification of a church as a "permitted use" in the Airport Districts and University District is by adoption of a church as a Special Use with various restrictions from District B-1. (R.1-3, at 313, Section 159.51(A)(7); *id.*, at 318, Section 159.92(B)(1); *id.*, at 322, Section 159.100(B)(1).)

the property: (1) fronts on a primary arterial or collector street, (2) is contiguous on at least one side to a business district, and (3) resides on a lot that is at least three acres and is not more than 30% occupied by buildings. (*See* R.1-3, Zoning Code, Section 159.60, Land Use Chart; Section 159.61(C)(6) (E-R, Estate Residential District); Section 159.62(C)(4) (R-1, Single Family Residential); Section 159.63(C)(4) (R-2, Single Family Residential); Section 159.64(C)(4) (R-3, Single Family Residential); Section 159.65(C)(4) (R-4, Single Family Residential); Section 159.66(C)(4) (R-5, Single Family Residential); Section 159.67(C)(4) (R-6, Attached Residential); Section 159.68(C)(4) (R-7, General Residential); Section 159.69(C)(4) (R-5A, Single Family Residential); R.159.71(C)(1) (B-1 Local Shopping District).)

In the P-B, Planned Business District, which makes up the majority of the land area in the districts permitting "special use" churches, a church is subject to the above requirements, plus it is limited to a maximum square footage of 50,000 square foot, a lot between three to ten acres, and the property cannot have overhead or truck doors or manufacturing, industrial or warehouse type uses. (R.1-3, at Section 159.75(D)(10).) Further, the use "shall be evaluated based on the entirety of the circumstances affecting the particular property in the context of the existing and intended future use of the property" including total square footage, size of the lot, peak operation hours, primary and accessory uses, parking demand, traffic generation, other charitable uses in the area, efficient and creative use of subject property and "[o]ther criteria determined to be necessary to assess compliance with Section 159.176 [the Special Uses provision]. (*Id.*)

The Village presented unrefuted testimony that most of its churches are located within the Residential Zoning District which requires a special use permit for churches. Indeed, during Ms. Tate's tenure at the Village, the Village has never denied a request for a church to obtain a special use permit.

TFM's reliance on these restrictions as the basis for a violation of Section 2000cc(b)(3)(A), without more, does not establish that the Zoning Code completely and totally excludes religious assemblies.  As the Seventh Circuit teaches, a defendant municipality that permits churches in all residential districts as a special use, does not, in turn, completely or totally exclude religious assemblies from its jurisdiction under this provision.  *See Vision Church*, 468 F.3d at 989.  In doing so, the Seventh Circuit explained that the presence of six churches within the Village of Long Grove, Illinois, and the ability of a church to apply for a special use permit and fulfill the zoning code requirements, did not render the zoning regulations in violation of Section 2000cc(b)(3)(A).  *See id*. at 990.

The same situation in *Vision Church* is present here where the Village is not categorically excluding churches from its Districts, but has provided a list of criteria that a church must abide by to qualify as a permitted use in certain districts or to obtain a permit as a special use or conditional use in other districts.  These additional conditions or restrictions do not, alone, render the Zoning Code in violation of Section 2000cc(b)(3)(A).  *See id.* ("[h]ere, by contrast, if the conditions set forth in the Village's zoning code are fulfilled, a church may be built on property zoned for residential use.") (citing *R.V.S., L.L.C. v. City of Rockford,* 361 F.3d 402, 409 (7th Cir. 2004) (holding that an ordinance permitting nude dancing only as a special use did not "amount[ ] to a total ban on protected activity," because it placed restrictions only on the *location* of such businesses) (emphasis in original)).  As such, TFM has not shown a reasonable likelihood of success on a facial or as applied challenge that the Zoning Code completely and totally excludes churches—even small churches—from its Districts in violation of Section 2000cc(b)(3)(A).  The Court therefore denies TFM's motion for preliminary injunction on this basis.

**B.      Unreasonable Exclusion Under Section 2000cc(b)(3)(B)**

The Court's inquiry does not end here, however, because Section 2000cc(b)(3)(B) also prohibits a land use regulation that "unreasonably limits religious assemblies, institutions, or structures within a jurisdiction."  42 U.S.C. § 2000cc(b)(3)(B).  "As the legislative history evidences, '[w]hat is reasonable must be determined in light of all the facts, including the actual availability of land and the economics of religious organizations.'"  *Vision Church*, 468 F.3d at 990 (*citing* 146 Cong. Rec. E1563 (daily ed. Sept. 22, 2000) (statement of Rep. Canady)).

TFM's facial and as applied challenges under RLUIPA's unreasonable exclusion provision both fail based on the undeveloped record before the Court.  While churches are allowed in the Village, even when categorized as a "permitted use", the Zoning Code adopts them by reference to churches as a "special use" in other districts which includes certain restrictions that the property: (1) fronts on a primary arterial or collector street, (2) is contiguous on at least one side to a business district, and (3) resides on a lot that is at least three acres and is not more than 30% occupied by buildings.  (*See e.g.,* R.1-3, Zoning Code, Section 159.60, Land Use Chart; Section 159.61(C)(6) (E-R, Estate Residential District).  The one district—Downtown District—that allows churches as a "conditional use" provides less restrictions, but still requires a church to be "within 150 feet of Normantown Road & Independence Boulevard provided that they face and their lots have frontage on" either of those roads.  (R.1-3, at 265, Section 159.76(B)(8)(h).)  These restrictions, TFM asserts, effectively limit the available properties for small churches.      With regard to TFM's facial challenge, the Court must look to the actual availability of land and the economics for all "churches" as provided in the Zoning Code.  *Cf. Washington State Grange v. Wash. State Republican Party,* 552 U.S. 442, 449, 128 S.Ct. 1184, 170 L.Ed.2d 151 (2008) ("[A] plaintiff can only succeed in a facial challenge by establish[ing]

that no set of circumstances exists under which the Act would be valid, *i.e.,* that the law is unconstitutional in all of its applications.") (citation omitted). Here, TFM did not provide evidence regarding the availability of land for churches in general, but rather presented evidence regarding the unique limitations TFM faces as a small church. Indeed, TFM does not delineate for the Court in either its Complaint or its briefs the distinctions that the Court should make between the facial and as applied challenge with regard to its arguments. Based on the language of the Zoning Code, TFM's facial challenge should be directed to "churches", regardless of a specific size or budgetary restriction. TFM failed to provide the Court with evidence, however, regarding the general availability of land in the Village for churches, without specific consideration of a smaller church or a church with a property budget like TFM's budget. Furthermore, TFM failed to provide the Court with evidence regarding the economics of churches in the Village—e.g., the cost of starting a church, running a church, and providing for a church congregation. What evidence TFM did present, is limited to small churches like TFM. Although this evidence may be developed as the case proceeds through discovery, at this stage of the proceedings, TFM's evidence is insufficient to determine whether the Village's Zoning Code is "reasonable" because the Court lacks evidence to determine such reasonableness "in light of all the facts, including the actual availability of land and the economics of religious organizations." *See Vision Church*, 468 F.3d at 990. Because the record currently before the Court is insufficient to support TFM's facial challenge under the unreasonable limitations provision of RLUIPA, TFM's request for a preliminary injunction on this basis fails.

Regarding TFM's as applied challenge, the Court looks to the evidence TFM presented regarding small churches similarly situated to TFM. In particular, TFM asserts that the exclusions put in place by the Village speak to factors that deter small churches from locating in

the Village based on requirements for size, location, and accessibility of the suitable locations. While churches are allowed in the Village, even when a "permitted use", they are adopted by reference to churches as a "special use" in other districts which includes certain restrictions that the property: (1) fronts on a primary arterial or collector street, (2) is contiguous on at least one side to a business district, and (3) resides on a lot that is at least three acres and is not more than 30% occupied by buildings. (*See e.g.,* R.1-3, Zoning Code, Section 159.60, Land Use Chart; Section 159.61(C)(6) (E-R, Estate Residential District). The one district—Downtown District— that allows churches as a "conditional use" provides less restrictions, but still requires a church to be "within 150 feet of Normantown Road & Independence Boulevard provided that they face and their lots have frontage on" either of those roads. (R.1-3, at 265, Section 159.76(B)(8)(h).) These restrictions, TFM asserts, effectively limit the available properties for small churches.

TFM relies on *Chabad of Nova, Inc. v. City of Cooper City*, 575 F. Supp. 2d 1280 (S.D. Fl. 2008), arguing that lot size restrictions impose unreasonable limitations on small churches because the available options are over-sized and too expensive. In *Chabad*, a religious organization challenged the city's entire zoning code as an unreasonable limitation on religious assemblies pursuant to RLUIPA, Section 2000cc(b)(3). *Chabad*, 575 F. Supp. 2d at 1288. The *Chabad* court followed the Seventh Circuit's teaching in *Vision Church* and looked to "all the facts, including the actual availability of land and the economics of religious organizations." *Chabad*, 575 F.Supp.2d at 1289; *see also Church of Our Savior v. City of Jacksonville Beach,* 69 F. Supp. 3d 1299, 1325 (M.D. Fla. 2014) (explaining that "the focus of the Unreasonable Limitations provision is not on the treatment of a particular landowner, but religious entities in general. … Otherwise, the Unreasonable Limitations provision would largely duplicate the Substantial Burden provision"). The parties presented the *Chabad* court with, for example,

evidence of the average frontage of residential properties in the districts at issue and "extensive evidence" regarding the cost necessarily incurred by religious assemblies that would wish to locate in the districts. *Id.*

Here, presented evidence regarding the required property costs for a small church of less than approximately 250 members to purchase property in the Village that complies with the restrictions placed on churches in the various Districts. Mr. Polivka, TFM's real estate agent, generally testified, based on his personal knowledge from property searches he had conducted, that a piece of property in the Village meeting the 3-acre restriction could range anywhere from $750,000 to well over a million dollars. Further, Mr. Polivka stated that the size property that fits within TFM's budget is not available in any district that permits a church as a "special" or "conditional" use. TFM provided evidence that one of the properties it identified that fit its criteria was available for $695,000. (*See* PI Hrg., Ex. 23.) Although the Village ultimately denied this property as a potential location for TFM, it shows that a cost of $750,000 to well over a million dollars, while more than what TFM's budget allows, is not a differential that the Court finds—based on the evidence before it—to be unreasonable under RLUIPA. This evidence is specific to TFM's experience, however, and not evidence of the general experience for churches—or even generally as related to small churches—in the Village. Indeed, TFM presented no evidence regarding churches in general or the availability of land and economics of religious organizations in general, and instead limited its arguments to the experience of TFM and churches like TFM. *See Chabad*, 575 F.Supp.2d at 1289; *Church of Our Savior v.* 69 F. Supp. 3d at 1325. Without additional evidence, the Court is left with inadequate support for TFM's motion requesting the "extraordinary remedy" of a preliminary injunction. In particular, the evidence does not allow the Court to properly evaluate TFM's claim to determine whether

the conditional use and special use permits are unreasonable or limit churches, like TFM, in a manner that violates RLUIPA. Accordingly, the Court finds that TFM has not shown a reasonable likelihood of success that the Zoning Code violates Section 2000cc(b)(3)(B) of RLUIPA. The Court, therefore, denies TFM's request for a preliminary injunction on this basis.

### C. Equal Terms

Further, TFM alleges that the Zoning Code violates Section 2000cc(b)(1) of RLUIPA which provides that "[n]o government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution." 42 U.S.C. § 2000cc(b)(1). As the Seventh Circuit teaches, a regulation will violate the Equal Terms provision [of RLUIPA] only if it treats religious assemblies or institutions less well than secular assemblies or institutions that are similarly situated as to the accepted zoning criteria. *River of Life Kingdom Ministries v. Vill. of Hazel Crest, Ill.,* 611 F.3d 367, 368 (7th Cir. 2010) (*en banc*) (adopting a revised version of the Third Circuit's test for violation of the equal terms provision of RLUIPA); *see also Digrugilliers v. Consol. City of Indianapolis*, 506 F.3d 612, 616 (7th Cir. 2007) (citations omitted) (explaining that the equal-terms section of RLUIPA is violated whenever religious land uses are treated worse than comparable nonreligious ones, whether or not the discrimination imposes a substantial burden on the religious uses). "To prevail on an equal-terms claim, TFM must show that 'religious and secular land uses [have not been] … treated the same … from the standpoint of [an] accepted zoning criterion." *Irshad Learning Ctr. v. Cnty. of Dupage*, 937 F.Supp.2d 910, 936 (N.D. Ill. 2013) (*citing River of Life*, 611 F.3d at 373).

The Seventh Circuit recognizes "three distinct kinds of Equal Terms statutory violations: (1) a statute that facially differentiates between religious and nonreligious assemblies or

institutions; (2) a facially neutral statute that is nevertheless 'gerrymandered' to place a burden

solely on religious, as opposed to nonreligious, assemblies or institutions; or (3) a truly neutral

statue that is selectively enforced against religious, as opposed to nonreligious assemblies or

institutions." *Irshad Learning Ctr.,* 937 F.Supp.2d at 932 (*citing Vision Church*, 468 F.3d at

1003). TFM presents a facial and as applied challenge to the Village's Zoning Code as violating

RLUIPA's Equal Terms provision limiting its challenge to the M-R District.

Both TFM's facial and as applied equal terms challenges fail. TFM's equal terms

argument highlights the District where the Sherman Property is located in, the M-R District,[6]

which prohibits churches. (R.1, ¶ 20.) The M-R District does, however, permit nonreligious

assembly and institutional uses of "[p]ublic, quasi-public, and governmental buildings and

facilities" that includes museums and art galleries. (*See* R.26, at § 159.081(B)(3)(b).) Although

TFM does not differentiate between its facial challenge and as applied challenge, the Court

construes TFM's facial argument as based on the differential treatment churches receive, namely

prohibition under the Zoning Code in the M-R District as compared to museums and art galleries

that are permitted uses in that District. The problem with TFM's argument, however, is that it

has failed to provide evidence showing a relationship between the comparative uses and the

accepted zoning criteria, as required by the Seventh Circuit's decision *River of Life.*

At this procedural posture, TFM is required to demonstrate a reasonable likelihood of

success that the Zoning Code facially differentiates between religious and nonreligious

assemblies. *Irshad Learning Ctr.*, 937 F. Supp. 2d at 936 (*citing Vision Church*, 468 F.3d at

1003). In doing so, TFM must show that the Zoning Code treats religious assemblies or

---

[6] TFM references multiple districts in its Complaint in support of its facial challenge to the
Village's Zoning Code as violating the equal-terms provision of RLUIPA, but stated that its preliminary
injunction allegation of equal-terms provision violations are limited to the M-R. (*See* R.1, ¶¶ 17-19, R.6,
¶ 22; PI Hrg. Tr., 35:23-24.)

institutions less favorably than secular assemblies or institutions that are similarly situated as to the accepted zoning criteria. *See River of Life,* 611 F.3d at 368; *see Digrugillies v. Consolidated City of Indianapolis*, 506 F.3d 612, 616 (7th Cir. 2007) ("The equal-terms section is violated whenever religious land uses are treated worse than comparable nonreligious ones, whether or not the discrimination imposes a substantial burden on the religious uses"). The test that the Seventh Circuit adopted from the Third Circuit explicitly indicates that a regulation will violate the Equal Terms provision if the religious and secular assemblies that the plaintiff alleges are treated less well, are "similarly situated." *See River of Life*, 611 F.3d at 369 (citing *Lighthouse Institute for Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253, 266 (3d Cir. 2007)). The Third Circuit's test for "similarly situated" evaluates the similarities between the claimant and the comparator by reference to the "purpose" of the regulation. *See Lighthouse*, 510 F.3d at 266 (holding that "a [land use] regulation will violate the Equal Terms provision only if it treats religious assemblies or institutions less well than secular assemblies or institutions that are similarly situated *as to the regulatory purpose*") (emphasis in original). The Seventh Circuit's test retains this "similarly situated" language, but applies it not to the regulatory purpose, but rather to the objective standard of "accepted zoning criteria". *See River of Life*, 611 F.3d at 371 ("The problems that we have identified with the Third Circuit's test can be solved by a shift of focus from regulatory *purpose* to accepted zoning *criteria*") (emphasis in original). Therefore, by analogy, under the Seventh Circuit's test, the Court should evaluate the "similarity" between the claimant and the comparator by reference to the "accepted zoning criteria" in the Zoning Code.

TFM's argument fails here —whether facial or as applied—because TFM did not provide evidence linking the alleged uses for a church and a museum or art gallery by reference to any of

the accepted zoning criteria. In fact, the Village Zoning Code indicates specific intent and purpose criteria in the first section of each zoning district. (*See e.g.,* R.26, §§ 159.061(A)-159.076(A); §§ 159.080(A)-159-084(A).) The M-R District has 8 enumerated points listed in its intent and purpose subsection and TFM did not provide argument in its briefing, nor did it elicit testimony at the hearing, related to any of the 8 enumerated intents and purposes. The testimony provided by the Village regarding the museum and art gallery as a permitted use in the M-R District indicated that this use is intended to be for a manufacturing or industrial business in that District that has an artisan who wants to display some of his or her work. (*See* PI Hrg. Tr. 136:11-19.) Although TFM may develop these facts during discovery, the limited record before the Court does not support the application of a conventional understanding of a museum as a standard large, commercial museum for patrons to come and visit based on the accepted zoning criteria to the M-R district. Rather, the record indicates that the permitted use as a museum or art gallery within the M-R district is intended to be applicable to the manufacturing and industrial businesses in the district, to allow the industrial inhabitants limited displays of works of art. This understanding also directly comports with one of the stated intents and purposes "[t]o discourage the intrusion of residential and commercial uses which are incompatible with planned industrial uses". (R.26, at § 159.081(A)(8).)

TFM does not connect the alleged similar uses to the "accepted zoning criteria" in a manner that allows the Court to conduct a proper analysis demanded by the Seventh Circuit in *River of Life.* As the Seventh Circuit instructs, "[i]f a church and a community, though different in many respects, do not differ with respect to any accepted zoning criterion, then an ordinance that allows one and forbids the other denies equality and violates the equal-terms provision." *River of Life*, 611 F.34d at 371. TFM's reliance on the M-R District where the Sherman Property

resides shows that the District is generally comprised of manufacturing and manufacturing-related uses and that the district seeks to "discourage the intrusion of residential and commercial uses which are incompatible with planned industrial uses." (R.1-3, at 292.) The mere listing of a museum or art gallery as a permitted use in "public, quasi-public, and governmental buildings and facilities"—without more—does not establish that the Zoning Code's M-R District violates the equal terms provision of RLUIPA. To clarify, without any additional evidence and analysis, the Court cannot determine whether the Village made its particular zoning decisions in the M-R district motivated by a land-use concern that is neutral from the standpoint of religion. *See River of Life*, 611 F.3d at 373.

TFM's as applied challenge similarly fails. "A plaintiff bringing an as-applied equal-terms challenge must present evidence that a nonreligious comparator received unequal treatment under the challenged regulation." *Irshad Learning Ctr.*, 937 F. Supp. 2d at 933 (citing *Primera Iglesia Baustista Hispana of Boca Raton, Inc. v. Broward Cnty.*, 450 F.3d 1295, 1308 (11th Cir. 2006).)[7] If a church and a community center, for example, "though different in many respects, do not differ with respect to any accepted zoning criterion, then an ordinance that allows one and forbids the other denies equality and violate the equal-terms provision." *River of Life*, 611 F.3d at 371. Without offering a suitable comparator, however, Plaintiff has not presented cognizable evidence of less than equal treatment. *Irshad Learning Ctr.*, 937 F. Supp. 2d at 933 (citing *Primera Iglesia*, 450 F.3d at 1311 (citing 42 U.S.C. § 2000cc-2(b)) (conducting an as applied equal terms provision analysis).

Instead, TFM's argument is based on the differential treatment it received in comparison to museums and art galleries that are permitted uses in the M-R District. This argument fails, however, as the M-R District does not contain a museum or art gallery and the Village Planner

---

[7] The Seventh Circuit cited *Primera Iglesia* favorably in *Vision Church*, 468 F.3d at 1003.

testified that her interpretation of the allowance of museums and art galleries would be for artisan work spaces and small associated galleries up the front office, for example, and contain works generated from within a manufacturing business located within the M-R District. (PI Hrg. Tr. 136:11-19.) TFM did not provide any additional evidence challenging this understanding of a museum or art gallery in the M-R District, but instead argued about museums in Chicago (*see* R.6, at 11) or vaguely questioned witnesses about a hypothetical museum that could have a showing with 80 people, similar to a church. (PI Hrg. Tr., 24:24-25:13.) *See Ehrhart v. Sec'y of Health & Human Servs.*, 969 F.2d 534, 537 (7th Cir. 1992) ("[o]nce again we observe that compelling the court to take up a burdensome and fruitless scavenger hunt for arguments is a drain on its time and resources") (citing *United States v. Dunkel,* 927 F.2d 955, 956 (7th Cir. 1991) (per curiam) ("Judges are not like pigs, hunting for truffles buried in briefs)"). As such, based on the evidence in the record, the Court denies TFM's motion for a preliminary injunction in this regard as it has not shown a reasonable likelihood of success that the Village's Zoning Code violated the Equal Terms provision of RLUIPA.[8]

The Court finds that TFM has not established a reasonable likelihood of success on the merits for any of the asserted federal claims, upon which it based its motion, that the Village violated RLUIPA. Because the Court concludes that TFM has not established a reasonable

---

[8] TFM also alleges that the "this less than equal treatment has made it impossible for TFM to relocate within the Village, when many nonreligious assembly and institutional uses could relocate under the [Zoning Code] in TFM's circumstances." (*See* R.1, ¶ 15.) The Court notes, however, that the Seventh Circuit has specifically explained that the equal terms provision of RLUIPA is violated whenever religious land uses are treated worse than comparable nonreligious ones, whether or not the discrimination imposes a substantial burden on the religious use. *See Digrugilliers v. Consol. City of Indianapolis*, 506 F.3d at 616; *see also Irshad Learning Ctr.,* 937 F. Supp. 2d at 941 ("The Seventh Circuit has determined that a government action imposes a substantial burden on religious exercise if it "'necessarily bears direct, primary, and fundamental responsibility for rendering religious exercise— including the use of real property for the purpose thereof within the regulated jurisdiction generally— effectively impracticable'") (citing *Vision Church,* 468 F.3d at 997). TFM has not alleged a substantial burden argument here.

likelihood of success on the merits at this juncture, it need not address the additional preliminary injunction requirements related to the irreparable injury, public interest, and the balance of harms.

**CONCLUSION**

For these reasons, the Court denies TFM's motion for a preliminary injunction.

**Dated:**  February 26, 2016

**ENTERED**

_____

**AMY J. ST. EVE**
**United States District Court Judge**